IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 24, 2009 Session

**STATE OF TENNESSEE v. STEVE FREDRICK RICKETT**

**Appeal from the Criminal Court for Knox County**
**No. 83316     Richard Baumgartner, Judge**

---

**No. E2008-00670-CCA-R3-CD - Filed May 13, 2010**

---

The Defendant, Steve Fredrick Rickett,[1] appeals his conviction by a jury in the Knox County Criminal Court for second degree murder for which he was sentenced as a Range I, violent offender to sixteen years in the Department of Correction. The Defendant contends the following: (1) the evidence was insufficient to support his conviction, (2) the trial court erred in allowing expert witness testimony because the Defendant received inadequate notice of the scope of the expert's testimony and in not granting a continuance, (3) the trial court erred in allowing the county medical examiner to testify to the effects of alcohol and narcotics on the victim, (4) the trial court erred in failing to grant the Defendant's motion for a continuance to allow a defense expert additional time to test the shirt the victim was wearing when she was shot, (5) the trial court erred in allowing into evidence the Defendant's statements to police, (6) the trial court erred in allowing the State to amend the toxicology report during the trial, and (7) the trial court erred in failing to respond properly to the jury's questions requesting a definition of heat of passion and whether "voluntary intoxication" constituted "heat of passion." We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Mark E. Stephens, District Public Defender, for the appellant, Steve Fredrick Rickett.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Randall E. Nichols, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1]Although the indictment and judgment use the name Ricketts, the record, including a court order, reflects that the Defendant's last name is Rickett.

# OPINION

This case arises from the fatal shooting of Joyce Ann Davis. At the trial, Jack Price, a records specialist for the Knox County 9-1-1 system, testified that a 9-1-1 call was received on August 8, 2005, originating from the victim's address. In the 9-1-1 call, the Defendant said that his wife was dead, that they were playing with a shotgun, that the victim pulled the barrel, and that the gun went off. The Defendant then said that the victim was bleeding to death. The Defendant gave his name, asked for help, and asked the 9-1-1 dispatcher to hurry. The Defendant said that the victim was not breathing and that he believed she was dead. When asked if he needed assistance in performing CPR, the Defendant stated that he knew how to perform it and was trying to "as soon as I get off the phone." He said "bye" and disconnected.

Officer Phillip E. Dalton of the Knox County Sheriff's Office testified that in response to the 9-1-1 call originating from the victim's address, he activated his emergency equipment, including the in-cruiser camera and microphone. He said he proceeded into the residence with his weapon drawn because of the nature of the emergency call. He said that the Defendant was standing in the living room and that a shotgun was to the left. He said he handed the shotgun to another officer, who cleared it for safety. He said the victim was lying on the couch, with her head back, her arms to her side, and her feet in front of her. He said she had a shotgun wound in her chest. He confirmed that several photographs accurately depicted the victim in the position in which she was found, and those photographs were received into evidence. Officer Dalton said that he asked the Defendant to step outside and that this portion of their conversation was recorded by his in-cruiser video and audio recording equipment. The recording of Officer Dalton's arrival and his conversation with the Defendant was played for the jury. He confirmed that a dog could be heard barking and that he asked the Defendant to put the dog into a back room. Officer Dalton testified the video recording was a fair and accurate representation of what had transpired, and he identified the Defendant in the courtroom.

On cross-examination, Officer Dalton testified that in his opinion, the Defendant was intoxicated. He said that the Defendant's speech was slurred and that the Defendant smelled of an alcoholic beverage. He confirmed a whiskey bottle was in the middle of the living room floor. He said he had no trouble hearing the dog barking. He acknowledged that the dog sounded as if it might be vicious. He agreed that his conversation with the Defendant lasted several minutes, and he did not dispute that the Defendant said nine times during the conversation that the victim grabbed or pulled the gun. He acknowledged that the Defendant's statements regarding the victim's pulling or grabbing the gun remained consistent.

Angie Varner with the Forensic Services Division of the Knox County Sheriff's Department testified that she responded to a call concerning the victim's shooting. She said that Officer Park, who was her relief, stated that the scene might take more than one person to process. She said that when she arrived, a few officers were sitting or standing on the front porch with another man, whom she identified as the Defendant. She said that when she arrived, the television's volume was very loud and that someone turned it off. She said the victim was leaning back on the sofa with a shotgun wound to her chest. She said she photographed the scene, including the positioning of the victim, and she identified the photographs of the following: the victim; a wall where shotgun pellets hit; the kitchen; the bedroom; the ceiling, which showed evidence of shotgun blasts; the shotgun; a shell casing; and a shotgun shell. She also identified photographs of the Defendant which showed a scratch on his chin and scratches on his wrist and arm. She said that after she finished taking photographs, she collected the shotgun, the shell, and the shell casing, placed them in a box, and sealed the box with evidence tape. Officer Varner opened the sealed evidence box and displayed the shotgun and shell casings to the jury. She described the shotgun as a Winchester 12-gauge and identified it as the gun she collected from the scene. She said that the shotgun and the shell casing were sent to the Tennessee Bureau of Investigation (TBI).

On cross-examination, at the direction of defense counsel, Officer Varner racked the shotgun, which meant that she pulled the action bar to the rear and then pushed it fully forward. She agreed that a round would load into the chamber if ammunition were in the shotgun. When she was asked to rack the shotgun down and up again, it locked when it was racked up. She depressed the safety mechanism, but she said the shotgun could not be racked again. After defense counsel asked Officer Varner to depress another button on the shotgun, she was able to rack the gun. She said that two dogs were at the scene and that one was in a locked room. She said they barked loudly.

Officer Brad Parks testified that he had worked for the Knox County Sheriff's Office for twelve and one-half years. He testified that before his current employment, he had been employed as a physical science technician with the firearms and toolmarks unit at the FBI Laboratory in Washington, DC, and as a firearms and toolmarks examiner with the Kentucky State Police. He testified that he held a bachelor's degree in criminal justice and had attended several schools specializing in criminal investigation and analysis.

Officer Parks testified that he responded to the 9-1-1 call at the victim's residence. He said that when he arrived, a man was sitting outside on the porch with several officers and that the shotgun had been secured by the officers. He described the scene, and he stated that the victim's injury was "a significantly large hole from a shotgun." He said that based upon his training and experience, shotgun pellets exit a 12-gauge shotgun barrel at approximately three-quarters of an inch in diameter and that they spread an average of one inch in diameter

per yard. He said that based upon the diameter of the wound, he knew that the shot was fired at "some distance" and was "larger than being a contact or near contact" wound. He said that he and Officer Varner took measurements with a ruler from inside the house and prepared a diagram of the victim's residence, including notations of where the victim's body lay, where the liquor bottle was found, and where the shotgun had been located.

Officer Parks testified that he used gunshot residue collection kits on the victim and the Defendant. He said that he sent the kits to the TBI for processing but that no test was performed for the victim because a swab was missing out of her kit. He stated that he had no explanation for why a swab was missing out of the victim's gunshot residue kit. He said that he had prepared hundreds of kits, that Officer Varner was present when he collected the specimens, and that the collection kits were mailed to the TBI along with other evidence in this case.

On cross-examination, Officer Parks testified that his diagram plainly noted that it was not to scale. He agreed that the purported angle reflected was not the trajectory angle of the gunshot. He did not recall whether the couch's position was accurately depicted on his drawing, but he agreed that the couch may have been positioned differently. He agreed that if the couch had been positioned differently than shown on the diagram, the trajectory angle of the shot could have been between 50 and 55 degrees as opposed to a lesser angle. He acknowledged that his diagram did not purport to reflect the precise location of the furniture in the room where the victim was shot. He read a letter from the TBI which stated that the gunshot residue kit submitted for the victim was not suitable for gunshot residue analysis because it required eight hand swabs and two control swabs. The letter directed Lieutenant Terry Lee of the Knox County Sheriff's Office to contact J. Russell Davis, the TBI's forensic scientist, for further assistance. He said that he was made aware of the letter by Lieutenant Lee but that he did not contact Agent Davis. He said that he did not know to which swab the letter referred and that he did not follow up to discover the error with the residue testing kit. He said that he conducted the gunshot residue kits to provide information about whether the victim or the Defendant had fired or handled a weapon. He said he had no knowledge whether any pellets were found outside the victim's body.

Special Agent Jeff Crews, a forensic scientist with the TBI, was accepted as an expert in alcohol and urine analysis. Agent Crews said that he performed the official alcohol report on the victim. He said that a blood sample was received from Dr. Sandra Elkins, the Knox County Medical Examiner, that he analyzed it, and that he determined the victim's blood alcohol to be 0.29 percent. He said the legal blood alcohol limit in Tennessee was 0.08 percent. He said that he analyzed the alcohol content of the victim's urine and found it to be .33 percent. He explained that the difference in the percentages was not significant because

alcohol concentrates in the urine before it is voided from the body. He said that he could not determine when the victim started drinking alcohol or when she last took a drink of alcohol.

On cross-examination, Agent Crews agreed that he had conducted thousands of examinations similar to the one of the victim. He said that a blood alcohol content of .29 was considered high but that he had seen higher.

Special Agent John Harrison, a forensic scientist with the TBI, testified that he prepared the official toxicology report concerning the drugs in the victim's blood and urine. He said the first report reflected that the victim tested positive for lidocaine and for oxazepam at 0.13 micrograms per milliliter ($\mu$G/mL). He said that the victim actually tested positive for lidocaine and for oxycodone at 0.13 $\mu$G/mL, that he noticed the typographical error on the report just before he came to court, and that he reported the error to the district attorney general. He said that oxazepam is a Benzodiazepine drug and that it is "[a]n entirely different drug" from oxycodone, which "is an opiate type drug." He said that opiates are a very strong group of drugs prescribed for pain relief and that they have impairing consequences. He said that lidocaine is often given in emergency procedures to start the heart and that it is also found in some mouthwashes. When asked why he was able to determine oxycodone levels in blood but not urine, he replied that blood levels of oxycodone, not urine levels, reflected the impairment value upon an individual. The toxicology report that Agent Harrison had amended to reflect oxycodone instead of oxazepam was received into evidence.

On cross-examination, Agent Harrison testified that he made a typographical error when entering the code for oxycodone into the final report. He said that he used a mass spectrometer to determine what drugs were present in the sample and that the computer generated a printout showing the drugs and the levels identified. He agreed that the computer printout listed the name of the drug and a code number. He said that he created an official report based on the data from the mass spectrometer. He said that the program for generating the official report required him to enter three or four letters of the drug's name, that the code for oxazepam is OXYZ and the code for oxycodone is OXYC, and that he made an error when entering the code. He stated that neither he nor another person who reviewed the official report caught the error and that he did not see the error when he looked at the file again a few days before the trial. He said he first recognized the error approximately twenty to thirty minutes before he testified. He agreed that the parties had been operating under a misapprehension for eighteen months that there was a different drug in the victim's system. He acknowledged that if he had not detected the error, no supporting documentation would have indicated that there was a mistake because the supporting documentation was contained as part of his file to which the Defendant did not have access. He said that he caught the mistake because he noticed he had handwritten OXYC on the mass spectrometer printout,

which was the code for oxycodone, and that the official report stated oxazepam. Agent Harrison testified that the therapeutic levels for oxycodone range between 0.01 to 0.10 μG/mL and that the victim's 0.13 level would be higher than the therapeutic range.

On redirect examination, Agent Harrison testified that a therapeutic level is a range a physician would try to achieve in the body to exert the effects of the drug. He said that analgesic effects or pain-relieving effects of oxycodone would be found in most patients between levels of 0.01 to 0.10.

Charles Webber, the victim's younger half-brother, testified that the victim was fifty-one years old and that he was familiar with her medical condition. He said that she was diagnosed with cancer about a year and a half before her death. He said that he saw his sister at least once a week from the time of diagnosis until her death and that he called her every day. He said that when she was hospitalized, he would visit her every day. He said the victim's cancer caused her difficulty in speaking, in eating, and in walking. He stated that she started sleeping on the couch in the living room, that she kept her medications on a chair next to her, and that she used a portable toilet chair. He said that she weighed about 165 to 170 pounds before her illness and that her illness caused her to lose weight. He said that at the time of her death, the victim barely had the strength to pick up her three- to four-pound Chihuahua.

Mr. Webber testified that the victim had throat cancer but that she continued to smoke. He said he had seen her drink one or two beers but never liquor. He said that he had never purchased beer for the victim but that he had purchased food for her. He said that he had never seen the victim in possession of a shotgun, that he had not seen the shotgun used in the killing, and that he did not know where the shotgun had been kept.

On cross-examination, Mr. Webber testified that when he visited the victim, he would honk his car's horn, and the victim or the Defendant would lock the larger dog in the bathroom. He said that before the victim became ill, she or the Defendant would walk onto the porch to greet him. He said that after the victim became ill, he would honk the horn and walk to the porch, and the victim would tell him to come inside. He said the Defendant was there "most of the time," but he acknowledged that the Defendant was working from October until December 2004, after the victim was diagnosed with cancer, and that the Defendant was not there to put up the dog. He said that he did not know the victim's landlord or that the house had belonged to the landlord's father. He also acknowledged that he did not know the landlord spent significant amounts of time on the front porch with the victim and the Defendant and that he had never seen the landlord in the two years of weekly visits. He thought the victim drove herself to some of her chemotherapy treatments, but he did not know who took her other times. He said the victim asked him to buy the chickens for her

because her doctors were concerned that she was not eating. He said that as far as he knew, the victim did not like guns. He said he did not know that on the day she was shot, the victim called a pawnshop trying to purchase a gun. He said he did not know that the victim called J.W. or Sandra Rickett asking to get a gun. He said he did not know that the victim owned a .22 caliber pistol or that she was arrested for shooting at her sons. When asked if his relationship with the victim was close enough for him to know that she was asking how to commit suicide, he responded that it was not. He said he did not know that the victim was asking people to occupy the Defendant away from the house so that she could kill herself. He said that the victim was in pain but that she would not commit suicide.

Mr. Webber confirmed that in more than one hundred visits, he saw the victim drink beer only once or twice, and he said that she did not drink beer until the "doctors put her on beer." He said he did not know her doctors but that one was in Oak Ridge. He said that she was confined to the living room. When asked if he knew that the victim was traveling with the Defendant two times a week to deliver eggs, he replied that he did not. He said he did not know that the victim and the Defendant kept a gun to protect their fifty chickens from foxes, hawks, and snakes or that they had lost thirty of their chickens to predators. He said he never saw the victim or the Defendant shoot the gun at animals.

Mr. Webber testified that his visits lasted about forty-five minutes. He said he saw the victim when she had a tube in her throat. He said he did not know who inserted the smaller tube that was required to clean the phlegm from her lungs, but he said he saw the victim perform the procedure once and assumed she always did it. He did not know how long she had the hole or tube in her throat. He did not know what kind of medication the victim was taking, except that it included pain pills, an inhaler, and something for her heart. He said she had asked the doctor for Megace to make her eat. He said that he once observed the victim take medication and that she swallowed pills with water.

Mr. Webber testified that he had an illness that required him to take medication on a regular basis and that the victim allowed him to receive his medication at her address on two occasions, while he was in the process of moving. He would not agree that he received the medication at the victim's address in an effort to conceal the nature of his illness from his employers.

Special Agent Shelly Betts of the TBI's firearms identification unit testified that she had advanced training by the Association of Firearm and Toolmark Examiners. She said that she was trained in muzzle to garment distance determination, a chemical test on clothing to determine the distance between the muzzle of a gun and a person who is shot. She said that she had examined thousands of fired bullets, cartridge cases, and shot shells and linked them to the specific weapon from which they had been fired. She explained the three types of

shotguns and how each works. She said that a pump-action shotgun is loaded by placing shot shells into the magazine tube and that a shell is chambered by manually cycling the forearms of the shotgun. Once the shot is fired, the shotgun must be manually cycled again. She said that if one pulls the trigger with a live cartridge inside the chamber, the shot shell will not be ejected until the forearm is cycled. She said that the shot pellets, shot wad, and gunshot components exit a shotgun's muzzle. She said that lead vapor, partially burned and unburned gunpowder, lead particulate, and dirt and oil will also be ejected. She explained that lead vapor is a component of the shot shell primer.

Special Agent Betts testified that she determined the shotgun was a Mossberg Maverick Model 88 12-gauge, pump-action shotgun with a modified choke. She explained that a modified choke is a constriction at the muzzle end, which causes the pellets to stay in a tighter pattern to a farther distance. She said the shotgun's safety button was functioning. She demonstrated loading and chambering a shell. She said that if a live shell were chambered, pulling the forearm of the gun would discharge the shot shell from the chamber. She said the trigger pull, the amount of pressure required to pull the trigger of the shotgun, was seven and one-quarter pounds. She said that according to the manufacturer's specifications, the gun also weighed approximately seven and one-quarter pounds. She determined that the gun's barrel length was twenty-eight inches and its overall length was forty-seven and one-half inches. She said that she test-fired the shotgun at different distances to produce test patterns but that she said she did not test-fire the gun before she had looked at the shirt the victim had been wearing.

Agent Betts testified that she examined the fired shot shell case that was recovered from the scene and determined that it had been fired from the shotgun. She said that the lead pellets were size six lead shot and that it was important for her to use the same ammunition in the distance tests. She said the shotgun wad was consistent with that being manufactured by Winchester.

Agent Betts identified the victim's T-shirt that she had examined. She stated that the shirt had a shot pattern in the upper chest area, slightly to the right of center. She said that the back of the shirt, near the right armpit, showed an area consistent with the passage of lead pellets. She also said that the lower right-hand side had three or four holes. She explained that the presence of lead smoke or soot on clothing would indicate the shotgun had been fired from a distance of approximately eighteen inches to two feet. She said that she found no visible smoke or graying around the three areas of holes nor did she see any singeing or burning of the fibers. She did not observe any unburned or partially burned gunpowder. She said that she conducted chemical tests to detect lead vapor, which would occur when a shotgun was fired from a distance of up to eighteen inches, and for pellet wipe, which would indicate that a projectile traveled through the fabric. She said that she found lead consistent

with pellet wipe surrounding the large hole in the front of the T-shirt and on the smaller holes on the back of the T-shirt. Agent Betts also said that a shotgun wad could have traveled through the large hole. She said there was no indication that the holes on the bottom right of the T-shirt were caused by any type of gunshot. She said that she did not find any lead vapor on the T-shirt.

Agent Betts testified that she conducted shot pattern tests on cardboard at distances of five, ten, fifteen, twenty, twenty-five, and thirty feet. She identified the diagrams that she had made of each shot pattern test, and she wrote the measurements of each test shot's central defect and overall spread pattern. She described the central defects and overall spread patterns produced at the various tested distances and concluded that the pattern on the T-shirt could be produced at distances of greater than five feet but less than twenty-five feet. Agent Betts testified that she was provided a picture of the hole in the victim's chest but that she did not have the accurate measurements, and she said she compared the test shots to the pattern in the T-shirt and not to the victim's wound. She said that she memorialized her findings in an official TBI firearms report. Agent Betts provided a sample of a shot shell similar to the one used in the case and described how a shell is constructed. The shotgun wad and pellets, the diagrams of the several test shot patterns, the firearms report, the photographs of the victim's T-shirt, the gunpowder, and the sample shotgun shell were received into evidence.

On cross-examination, Agent Betts testified that she did not indicate in her report that there were "ratty edges" on large hole in the victim's T-shirt. She said that she wrote in her notes "large hole." She removed the victim's T-shirt from the evidence bag and confirmed that during her initial visual inspection, she did not see any soot or smoke. She did not understand what defense counsel meant when he asked her if she saw carbon deposits on the T-shirt. She explained that gunpowder is coated in graphite, which is carbon, and that partially burned or unburned gunpowder particles would appear on the fibers. She said that soot is the blackening of the garment from lead, vapor, lead particulate from the gun's barrel, and gunpowder particles. She confirmed that she did not see any soot or partially burned or unburned powder. When asked to examine the victim's T-shirt and magnified photographs that she had taken of the shirt, Agent Betts said she saw black dots, but she could not say what they were. She confirmed that she conducted chemical tests to determine whether gunpowder particles were present and that the test was negative. She explained that the Griess test detected burned and partially burned gunpowder but not unburned gunpowder and that unburned gunpowder could be detected only by visual inspection. However, she acknowledged that unburned powder was coated with a chemical that changed when gunpowder burns, often generating a positive reaction even with unburned particles. She acknowledged that it was her decision whether the black dots were unburned gunpowder, based solely on her visual inspection of the morphology and the size and color of the

particles. She said it was possible that unburned or partially burned gunpowder could leave marks consistent with those present on the T-shirt. She said that unburned or partially burned gunpowder would not travel as far as the shot pellets, but that some of the particulate could adhere to the wad and travel with it. She agreed that the presence of particles would be an indicator of distance between the barrel of a handgun or rifle and the victim, but she said that with shotguns, actual pellet spread is considered. When asked what her conclusion would have been if she found unburned and partially burned gunpowder on the shirt, she responded that the gunpowder would have formed an incomplete pattern and therefore, no conclusion could have been reached as to the distance. She confirmed that the only test to detect unburned gunpowder was a visual inspection.

Agent Betts testified that based upon the autopsy photographs, the direction of the shot looked as if it were from left to right and the trajectory of the shot looked as if it were from slightly up to down on the victim's body. She said she chose to use cardboard for the test shot patterns because cardboard shows the best pellet spread. She agreed that the pellet pattern on the shirt might be larger than the pattern on the body. She said it was necessary to replicate the pattern on the shirt because she did not examine the body and because she did not see the body. She said that the photographs she took had a scale in them but that was different than being "to scale." She agreed that the photographs showed the wound and the pellets. She acknowledged that if the victim's shirt were folded or creased, the pellet spread would be broader when the shirt was laid flat. She also agreed that she assumed that the victim's shirt was flat on her chest when the victim was shot. She said that fiber grabs smoke, vapor, and partially burned gunpowder more than cardboard would, but that she used cardboard to test fire because the holes are more readily visible. When asked why she test-fired at a ninety-degree angle, when she knew that the victim was shot at a different angle, she responded that she shot at that angle to get an accurate measurement of the pattern at the respective distances. She agreed that the victim's wound was wider than it was high, which reflected that the shot was at an angle. When asked how a test shot pattern from ninety degrees indicated distance when comparing against the victim's spread at thirty degrees, Agent Betts responded that there was a difference between minimal distance from the gun to the wound and up and down distance. She said she did not report horizontal distance, but she recorded those distances in her notes. She agreed that she had measured the horizontal distances and that on direct examination she had written the horizontal distances on the test pattern diagrams and had explained them to the jury. When asked if she were evaluating two very different things–horizontal and vertical distance of the pellet spread–she replied that she based her opinion on the density of the pellet spread and on the horizontal and vertical dimensions of the pellet spread. She agreed that the angle of the shot would affect the tightness of the spread in one dimension but not the other. She said she did not know the angle of the wound and that she did not question the medical examiner about it. However, she said she took into consideration a combination of factors, including the central wound,

-10-

the dimensions of the overall pellet spread, and the density of the pellets. When questioned whether the way she tested accurately reflected density as compared to the victim's wound, she replied that she compared the test patterns to the shirt and not to the body.

Agent Betts testified that she did not know the trigger travel distance of the shotgun and that she did not consider the information important. She said that she had fired the gun and that she would not be surprised if the trigger distance on the gun was a range of .122 of an inch to .129 of an inch. She said that some revolvers required a person to pull more than one-half inch. She said that although trigger travel distance could be important, the TBI measured only the weight required to pull the trigger.

Agent Betts testified that a dummy round weighed approximately the same as a live round. She loaded two dummy rounds into the magazine tube and held the gun at her hip with her right hand. She said the gun was heavy, and she agreed that once she moved her hand behind the balance point, the gun naturally tipped forward. She said the trigger pull required less force when pulled from the bottom than the top. She demonstrated for the jury and stated that if tipped downward, the weight of the loaded gun alone was enough to pull the trigger.

On redirect examination, Agent Betts testified that unburned gunpowder on the victim's shirt could appear gray but that it was more likely to appear beige or tan. She clarified her earlier testimony and explained that whether the shot was at ninety degrees or one hundred and eighty degrees, the total pattern size would be approximately the same. She said the dimension might spread a little, but the nominal measurement would remain the same. She said that, for example, if the overall size is three inches, but that when shooting at an angle, the dimension changes to three inches by four inches, the nominal measurement would be three inches. She said that her notes indicated that she had microscopically examined the three areas of the victim's shirt which had holes. She said that her notes reflected that she did not observe smoke or soot or any bullet or pellet wipe on any of the areas, nor did her chemical tests reveal the presence of partially burned or burned gunpowder. She said that the major defect in the T-shirt measured 3.5 by 4.5 inches and that the total pattern size was 7.5 by 7.75 inches.

On recross-examination, Agent Betts testified that sometimes "flier" pellets are outside the regular pattern and that she did not always consider them. She said she determined a flier pellet as being three or four inches outside of the central mass of the pattern. She said that she did not inform the medical examiner which holes she measured to determine pellet spread but that she provided a copy of the test patterns without measurements. When presented with pictures of the victim's body and asked to determine which pellet holes were considered fliers in the horizontal pellet spray, she responded that

-11-

she did not examine the body and did not know which holes were pellet holes. When asked to assume that all the holes were pellet holes, she said that she would consider the bottom hole and possibly another hole as fliers. She said the pellet spray looked as if it was at an angle, and she said she would probably use the vertical measurement. Upon defense counsel's request, she also marked the horizontal spread of the pellet spray.

Agent Betts testified that the cloth T-shirt did not stop many, if any, pellets from penetrating the victim. She said that cardboard reacts differently than human tissue and that she needed to shoot from a distance of about fifteen feet to achieve a horizontal pellet spread of 2.6 inches. When asked if, given the size of the victim's house, that the Defendant would have had to have been outside the house to have shot from fifteen feet away, Agent Betts replied that she did not know. She reiterated that she was comparing the test shots into cardboard to the pattern on the T-shirt, not the victim's body. She said that sometimes bullet wipe or pellet wipe is something that can be seen as a gray circle around the hole. She agreed that she visually inspected the T-shirt for pellet wipe and did not see any. She also agreed that she conducted a microscopic examination for pellet wipe and did not see any. She said she found it when she tested lead, or rhodizonate. She said that she conducted one test fire from each distance. The parties stipulated that both the fired shell and the unfired shell remained in the shotgun when the responding officer took the gun into custody and that the officer cleared the gun.

On redirect examination, Agent Betts agreed that at twenty and thirty feet, there were separate holes for the wad and the shotgun pellets, because the wad separated from the central mass of pellets at that distance. She said that at twenty-five feet, the wad probably went through the center mass. She said that when she examined the T-shirt microscopically, she could not see burned gunpowder, but that a chemical reaction would reveal its presence. On recross-examination, Agent Betts testified that she did not see pellet wipe under the microscope but that the chemical test revealed the presence of pellet wipe.

Sandra K. Elkins, M.D., the chief medical examiner for Knox County, was accepted as an expert in forensic pathology. She testified that she conducted an autopsy on the victim. She said that separate from the autopsy report, the medical examiners complete a one-page report of initial observations. She said that in this case, the victim's death was violent, that the probable cause of death was a shotgun wound to the chest, and that the manner of death was a homicide. She said the autopsy was conducted the day after the victim's death. She said the victim's clothing was given to the sheriff's department as evidence. She said the victim had an obvious shotgun wound to the chest, "slightly less than an inch right of her midline" with "multiple satellite pellet wounds extending out from the major hole of entrance." She identified autopsy photographs that showed various bruises on the victim's left and right forearms. She said the victim had senile ecchymosis on her left arm. She said

the victim had scars and a chemo-port likely used to treat for cancer. She also identified a photograph taken by the sheriff's department of the entrance wound and confirmed that it showed the damage to the victim's chest. She said there were some pellet exit or near-exit wounds on the far right side of the victim's back. She said that the majority of the shotgun pellets were in the back side of the victim's chest wall and that the plastic wad was recovered from the top of the upper lobe of the right lung. She said that sample pellets and the wad were collected and sent to the Knox County Sheriff's Department as evidence. She identified a photograph of the wadding that was recovered from the victim's chest. She agreed that she made a diagram of her findings and identified an enlarged copy on which she had written the measurements of the major wound and the satellite pellet holes. She said that she had measured the main hole in horizontal and vertical dimensions and then measured the pellet spread in the same dimensions. She said the measurements could be useful when test-firing the gun at different ranges.

Dr. Elkins testified that she performed a microscopic examination of the victim's lung, heart, liver, kidney, and brain. She said the liver showed moderate steatosis, which is fatty change, but the victim's liver was not cirrhotic. She said that fatty liver means that the liver cells have filled with fat.

Dr. Elkins testified that the trajectory of the shotgun blast through her body was from up to down and from left to right. She said that she determined the distance of the muzzle from the victim's flesh was five to eight feet. She said that she took samples of the victim's blood and urine to send to the TBI for analysis. She said that based on the amended TBI report which she received the day before she testified, the victim's blood alcohol concentration was 0.29 percent and the level of oxycodone was $0.13\mu G/mL$. She said that based upon her training and experience, she would expect a person with that level of alcohol and oxycodone in their system "to be sleeping it off." She said that the person's consciousness would be impaired, that the person would not have muscular coordination, and that with the combination of the oxycodone and alcohol–both of which are central nervous system depressants–she would expect the person to be "stuporous."

Dr. Elkins was asked to demonstrate how the victim might have pulled on the barrel of the shotgun. She said that if the victim had pulled on the barrel of the gun, she would expect the shot to be "more of a through and through" because to pull the shotgun hard enough would have required the victim to turn her front to the gun, and the blast would have gone "right through to her back." She also said she would expect significant injuries to the victim's hand if it was on the muzzle and that she would expect the "hand to have been in the other room." She said that if the victim's hand was not on the muzzle, but on the barrel, she would not expect to find pellet injuries on the victim's hand or arm. Using a yardstick to measure, she said that even at five feet the shotgun's barrel could not be grabbed at that

distance.  She said that she did not find any powder burns or stippling on the victim's injuries.  She said that stippling is punctate abrasions around the entrance wound.  She said stippling occurs when a gun is fired up to a distance of thirty-four inches.  She said she found no defensive wounds on the victim's hands.  She agreed that the victim's injuries were consistent with her being asleep on the couch and the Defendant's holding the shotgun five to eight feet away from her and angling the shot slightly downward at a left to right angle.

On cross-examination, Dr. Elkins testified that she did not notice any burns or other marks on the inside of the victim's arms that would indicate that her arms were in close proximity to the gun.  She said that regarding her demonstration of the victim's reaching out and holding onto the gun, she would expect to see some kind of wounds or soot if the victim had her hand very close to the barrel.  She said she did not know how far the shotgun discharged vapor or powder when it expelled a shell, but she acknowledged that she thought the barrel was fired from five to eight feet away from the victim.  She explained that synergistic effects of drugs meant that the effect of one drug is made worse by the combination with the other drug.  She agreed that she had testified that the victim's blood alcohol level and level of oxazepam would render the victim unable to drive.  She agreed that one of the important things in attempting to determine distance from the end of the barrel to the target were the dimensions of both the central defect and the pellet spread.  She agreed that the horizontal and the vertical measurements of pellet spread were equally important.  She said the victim had "rather fresh bruises on the left arm" and that the ones on the right arm "were fading bruises."  She said that in her opinion, the fresh bruises on the victim's right arm were unrelated to the shooting.  She agreed there were a number of possible explanations for the bruises on the victim's left arm, but she did not connect the events on the day of the shooting to those bruises.

On redirect examination, Dr. Elkins testified that senile ecchymosis occurs in people who are older and in poor medical condition.  She said that the skin becomes much thinner and that any amount of trauma, even carrying a plastic grocery bag's handles on the forearm, can cause bruises that do not heal well.  She said that although she found the victim's chemo-port in the chest wall, she found no traces of cancer in the victim's body.  On recross-examination, Dr. Elkins testified that alcohol consumption is one cause of fatty liver and that fatty liver, if caused by alcohol, can develop into cirrhosis of the liver.

Glen Edward Farr testified that he held a Ph.D. in pharmacy, that he was a licensed pharmacist in the state of Tennessee, and that he was a professor of clinical pharmacy at the University of Tennessee.  He was accepted as an expert in pharmacology.  He said that oxazepam is metabolized to temazepam.  He opined that the effects of the levels of oxazepam and alcohol reported in the victim's system would result in "substantial impairment."  He said that he later learned that the TBI report was incorrect and that victim was taking oxycodone

at the same level that had been reported for the oxazepam. He said that his opinion remained unchanged. He said he amended the report to say that there would still be substantial impairment of an individual with those levels of alcohol and oxycodone. He said that people have individual responses to drugs and alcohol. He said that at a blood alcohol level of .18 to .3, there would be disorientation, dizziness, exaggerated mental confusion, exaggerated emotional stress, crying, and fear. He said there would be a disturbance of perception and sensation. He said that some people might experience blurred vision, double vision, impaired balance, muscular incoordination, and staggering gait. He said that a blood alcohol level of .27 to .4, the upper end of the range, was classified as stupor and that a person would have inertia approaching paralysis, markedly decreased response to stimuli, marked muscular incoordination, and inability to stand or walk. He said that when oxycodone was added, it would intensify and push a person toward the upper range. He said that another factor pushing the victim to the upper range was her body weight of 122 pounds. He said the effects would be greater at that body weight than in a larger person. He said that a countering factor would be adrenaline or epinephrine release, the so-called fight or flight response, which would allow a person to be less depressed or less uncoordinated for a brief period of time. He said that another factor that would lower the range would be whether the victim was tolerant to the alcohol and oxycodone. He said that the difference between sleep and a stupor was that when a person was sleeping, he or she could be aroused fairly easily but that a person in a stupor cannot be aroused easily. Dr. Farr's amended report was accepted into evidence.

On cross-examination, Dr. Farr testified that the victim's blood alcohol range was on the border between the substantially impaired range of .18 to .30 and the stuporous range of .27 to .40. He agreed that factors could lower the range, including a tolerance to alcohol. He said that he did not know the victim's habits concerning alcohol consumption but that assuming the victim was a regular drinker–more than one or two drinks a day–her tolerance could not be quantified. He agreed that if the victim took oxycodone regularly, she would build a tolerance to the drug in addition to the alcohol. He said that he would not conclude that with the levels of alcohol and drugs in her system, the victim could not walk, but he said that she might be able to stumble. He said that it was possible that the victim was in a stuporous state but that it was also possible that adrenaline could overcome it, and that she could get up. He said that the victim's pharmacy records showed prescriptions for 120 pills of OxyContin (oxycodone) 40 milligrams, which was to be taken every twelve hours, but sometimes more often. He said the victim's prescription for hydrocodone would have been given for "breakthrough pain" because OxyContin was released slowly. He said that the prescriptions were for the upper level of the quantities generally seen but that nothing was unusual about the victim's prescriptions. He said a person's state of physical and mental health could effect the way a person metabolized drugs. He said that, for example, if the victim consumed large quantities of alcohol, she would have liver damage, which would slow

down the way she metabolized the drugs, making their levels higher.   He said he had seen only the pharmacy records, not the victim's medical records.

Robbie Jean Bunch, the victim's forty-three-year-old half-sister, testified that she last saw the victim alive a week before her death, when she mowed the victim's yard.  She said the victim was too sick to mow the yard.  She said that she visited her sister only about every two weeks because she was not allowed when the Defendant was there.  She said that the victim slept on the couch right inside the front door, that the dogs would sleep on the couch across from the victim, and that the Defendant would sleep in the bedroom.  She said that she had walked through the house before.  When shown photographs of shotgun blasts in the ceiling, she said she had never seen them.  She said the victim did not like shotguns, that she had never seen the victim with a shotgun, and that she did not know there was a shotgun in the house.  She said that when her sister was diagnosed with cancer, she stayed with the victim every night.  She said that after the victim was released from the hospital, the victim was able to eat soft foods such as applesauce and that the victim was so weak she could not get out of a chair by herself.  She said that the victim was not suicidal.

On cross-examination, Ms. Bunch testified that the victim did not talk to anyone about committing suicide.  When asked how she would know that, she replied that the victim was not that type of person.  When asked how she would know that the victim did not have conversations with Sandra Rickett and R.J. Rickett about killing herself and how she would know the victim did not call the pawnshop and ask for a "410" the morning she died, she replied that the victim would not have committed suicide.  She acknowledged that she knew how badly the victim suffered.  She denied that the victim's struggle made the victim want to give up.  She did not know how much baby food was in the house or how much the victim was eating.  She did not know why Webber brought Cornish hens or whether the victim could have eaten them.  She said that she cut the grass one time and that she guessed the Defendant cut the grass other times.  She did not know whether anyone else was taking care of the victim's chickens other than the Defendant.  She said she stayed with the victim at a hospital in Oak Ridge for two weeks, while the victim received chemotherapy treatment.  She was not aware that the victim's chemotherapy was for six weeks.  She said she did not know how long the chemotherapy took.  She said that when the victim did not spend the night in the hospital, either she, the victim's granddaughter, or the victim's son would drive her to the hospital.  She said that when the victim became very weak, the victim stayed in the hospital because traveling was too difficult.  She said she took the victim to the doctor and to radiation treatments.  She could not recall the location, but she said she followed the victim's directions.  She acknowledged that the victim had breathing problems but she denied seeing special breathing "contraptions" that used screens.  She said she had seen, though, the victim's breathing machine and portable oxygen canisters.  She acknowledged that she did

not sign any medical releases and was not listed as a contact person for the victim. She did not know who was listed.

Dennis J. Insell, a pharmacist employed at Apple Discount Drugs, testified that he provided the State with a copy of the drug printout for the victim. He said that it reflected the filled prescriptions for the victim covering three months. He said that in June, the victim was prescribed temazepam, for treating insomnia; lorazepam, for treating anxiety; Marinol, for treating nausea usually associated with cancer treatment; theophylline, which is a lung dilator to help with breathing; premarin, which is a combination of hormones to treat menopause symptoms; albuterol, an inhaler for asthma; a combination of Maalox, Benadryl, and lidocaine, which is used to treat mouth pain or thrush that is usually a side effect of chemotherapy; Nexium, for decreasing stomach acids and for treating ulcers; cilostazol, for treating circulation problems; OxyContin, a long-acting pain medicine; hydrocodone, a short-acting pain medicine; Megestrol, to stimulate appetite; and Mucinex, for congestion. The pharmacy report was received into evidence.

On cross-examination, Dr. Insell testified that the victim received 120 pills of hydrocodone on June 10, at a strength of either 10/500 or 10/650, representing the combination of hydrocodone and its Tylenol component. He said that it was the highest strength pill in which hydrocodone is made and that it was a potent pill. He agreed that the victim was provided 120 pills of OxyContin on June 14. He said the strength was forty milligrams, which was strong, although he said that it came in doses up to eighty milligrams. He said the frequency of dosage would be anywhere from six to eight times a day and that 120 pills would be a month's supply. He said that the dosage schedule for OxyContin was one every twelve hours. He said that as a person's body became used to a narcotic, the dosage might need to be increased. He said the victim started with one pill of OxyContin every twelve hours and then went to taking one pill three times a day, and finally taking two pills, two times a day. He agreed that the victim was building a tolerance to the drug. He said the victim received another 120 pills of OxyContin on July 13 and another 120 pills of hydrocodone on July 15. He said that he had an older pharmacy printout of the victim's prescriptions and that her first prescription for OxyContin was January 7, 2005, and he agreed that the victim had been taking it and hydrocodone for at least seven months before her death. The pharmacy printout was received into evidence. The State rested.

Sergeant David Davis with the Anderson County Sheriff's Department testified for the defense that he answered a call involving the victim on or about April 16, 2000. He said the call was a "shots-fired" call. He said that when he arrived at the scene, he spoke with the victim. He said the victim told him that her sons had come to her house, that she had tried to get them to leave, and that she had fired one warning shot. He said she did not indicate to whom the gun belonged.

-17-

On cross-examination, Sergeant Davis testified that he interviewed Dale Phillips, Cathy Hendricks, Cora Phillips, Danile Phillips, and the Defendant in connection with the victim's shooting a gun. On redirect examination, Sergeant Davis testified that he issued a warrant as a result of the victim's firing a gun. A certified copy of the warrant was received into evidence.

Randall Ray "Randy" Smith testified that he was the president of Smith Built Homes in Knoxville. He said that Smith Built builds residential homes. He said he employed the Defendant from January 2000 to mid-2004, and he said that he presently employed the Defendant. He said that he had contact with the Defendant every day from 2000 until the Defendant stopped working for Smith Built in 2004. He said that the Defendant's ability as a worker was "good, one of the best ones we had." He said the Defendant was "very reliable" and productive. He said the Defendant never caused trouble. He said that when the Defendant left in mid-2004, it was not because his employment was terminated. He said he told the Defendant that the Defendant was always welcome to come back and work whenever he wanted. He said that he did not know whether the Defendant would be able to return to work but that the Defendant kept contact with the superintendents, who wanted him to return. When asked whether the Defendant had an open invitation to return to work, Mr. Smith replied "pretty much, yes." He said that the Defendant began working for Smith Built again about six months before the trial. He agreed that the Defendant showed up one day to interview for a job, that he recognized the Defendant, and that he hired him. He said he was satisfied with the Defendant's present efforts. He said that probably no workers in his position produced any better than the Defendant. When asked if his offer for the Defendant to work continued into the future, he replied, "Oh, yes."

On cross-examination, Mr. Smith said that the Defendant's position with the company was as a general laborer for cleaning up. He said that the Defendant's primary responsibility was cleaning the insides of homes and that the Defendant did a good job of that. He said that the Defendant's jobs did not require any heavy lifting. He said that in the four years during which the Defendant worked for his company, he never observed the Defendant drink. He said that he did not socialize with the Defendant after work. He said the Defendant worked five days a week.

Edgar A. Pittman, a fifty-five-year-old warranty manager for Smith Built Homes, testified that his job was to take care of "anything that goes wrong with the houses." He said that he knew the Defendant but that he knew the Defendant better when he worked as a superintendent. He said that he worked as a superintendent until 2003. He said that the Defendant was a very dependable worker, that the Defendant did not cause trouble, and that the Defendant was productive. He said he knew the residence where the Defendant and the victim lived. He said he had been there in December of 2004 to take money and a fruit

-18-

basket because the victim was sick and the Defendant had not been able to work because he was staying with her. He said the crew with whom he worked contributed the money. He said that the Defendant met them at his car and that the Defendant was grateful for the gifts. He said he did not see the victim because he assumed that she was sick.

On cross-examination, Mr. Pittman testified that he delivered the money and the basket on Christmas Eve. He said he was unaware whether the victim was receiving social security benefits. He did not know whether the Defendant had sufficient money to put the shotgun on layaway on December 11, 2004, or whether the Defendant had sufficient money to purchase the shotgun on December 29, 2004.

On redirect examination, Mr. Pittman testified that he knew that the Defendant and the victim kept chickens at their home and that he knew they supplemented their income by selling eggs. He was not aware that they had a problem with hawks, foxes, and snakes, but he said he knew the Defendant sold "a bunch" of eggs. He said that the Defendant did not come to Smith Built to sell eggs but that the Defendant sold eggs to some who worked with him.

Issac Merkel, the Knox County Public Defender's Office computer systems administrator, testified that he sometimes helped with case-related activities such as those involving multimedia. He said that for the Defendant's case, he was asked to create a scale drawing of the victim's residence because the drawing in existence was not to scale. He said that he went to the house with defense counsel and a person identified as Mr. Bowlin and measured the front porch, the living room, the furniture, the widths of the doorways, and the distances from the walls to the furniture. He said that he took the data and created an accurate, computer-generated drawing to scale. He identified a copy of the drawing. He said that by the time he went to the residence, three items had been removed from the residence, so that the sizes of those objects on the drawing were estimates. He said the objects about which he had to estimate sizes were the two rocking chairs on the front porch and a chair inside the house. He agreed the sofas, the tables, the heater, and the entertainment center were still there. He said he included a ruler that would give scaled feet in order to measure any arbitrary distance. He said that the furniture had been moved around when he was there, but having measured the physical dimensions and comparing them to the police photographs, he was able to draw them "very close" to where they were on the night of the shooting, but "not precise to the inch."

On cross-examination, Mr. Merkle testified that he went to the crime scene just after the Labor Day holiday. He acknowledged that the crime happened on August 8, 2005, a month earlier. He agreed that in his drawing, the sofa was far enough from the front door that it could open without hitting the sofa. When presented with photographs of the crime

scene, he said that the perspective in the photographs did not clearly illustrate whether the door was in physical contact with the sofa.

Sandra Sue Rickett, the Defendant's sister-in-law, testified that she had known the Defendant and the victim for eleven years. She said she saw them once or twice a week. She said that her relationships with the Defendant and the victim were good ones. She said that she would speak with the victim on the telephone, that she would visit the victim's house, or that the victim and the Defendant would come to her house. She said she saw the Defendant and the victim drinking alcohol. She said that when they came to her house, they were drinking alcohol "[p]robably every time." She could not say whether she had ever seen the Defendant drunk, but she said that she had seen the victim drunk. She said that after the victim became ill, their contact became more frequent because she bought more eggs because the Defendant had stopped working and his income was from selling eggs. She said that she worked at a daycare center taking care of children and cooking. She said that her contacts with the victim took place at the daycare parking lot after the victim would call to arrange a delivery of eggs. She said that the victim and the Defendant would be in the car and that she would talk to them. She said that they smelled of alcohol most of the time.

Ms. Rickett testified that the victim's drinking habits and levels of intoxication were consistent through the eleven years. She said that she also cut hair and that she sometimes had difficulty cutting the victim's or the Defendant's hair because they were so intoxicated. She said that one time the victim was so intoxicated that she moved around. She said the victim once came to her house intoxicated and fell into her daughter. She said she knew that the victim had cancer. She said that when the victim was diagnosed with cancer, she weighed 160 or more pounds. She agreed the victim underwent radiation and chemotherapy treatments. She said she witnessed the victim's health deteriorate. She said she last saw the victim several weeks before the shooting.

On cross-examination, Ms. Rickett testified that the daycare center where she worked was in downtown Clinton, about thirty minutes from the victim's residence. She said that the Defendant and the victim met her at the center in both 2004 and 2005, until she started work with the school system in August 2005. In response to a question that if she smelled alcohol, she assumed the Defendant and the victim were drunk, she said that sometimes she could tell by the way the victim was sitting in the car that the victim had more than "just a drink." She said the smell of alcohol was in the car and that it could have come from the Defendant as well. She acknowledged that both of them could have been drunk. She said that if she did not meet the Defendant and the victim at the center, she would meet them at her house. She said that the last time she saw the victim was at her house sometime in July 2005. She said that the victim and the Defendant had been drinking. She said that her

husband, a retired police officer, was there. She acknowledged that she was not so concerned about their level of intoxication that she alerted the authorities.

Ms. Rickett testified that the victim fell into her child in December 2004, while trying to hand her child a Christmas present. She did not remember that the victim was released from the hospital in December 2004. She said that she cut the victim's hair in 2004 before the victim's hair fell out as a result of her cancer treatments.

James Pittman testified that he rented a home to the Defendant. He said that he lived approximately two-tenths of a mile from the house where the Defendant lived. He said that the house had been built by his father and his grandfather and that he owned about ten acres. He said that he could not see the Defendant's house from his. He said that he met the Defendant through his brother, Steve, who worked for Smith Built Homes. He said that about three years before the shooting occurred, his brother brought the Defendant and the victim to see the house because they needed a place to live. He said that he liked the victim. He said that the Defendant and the victim were willing to repair the house and that they lived there for three months in exchange for fixing it up. He said that after three months, they became regular renters and that he charged "so much a month and utilities." He said that they were very good renters and that they always paid on time. He said they would call after the victim received her check, and he would go to their house to retrieve it. He said the Defendant always handed him the rent. He said they liked chickens and pigs. He said he sometimes sat with them and watched the animals. He said the Defendant had a chicken coop and a chicken house, and he covered it so the hogs could not get in. He said they paid rent for August 2005, before the victim was killed on August 8. He said he had been to the house before August 8, and that the victim was obviously in pain, was uncomfortable, and had lost a lot of weight. He said she was able to walk onto the porch. He said he gave the August rent to the funeral home to help defer the costs of the victim's funeral. He said he did not know the victim's family, but he might have seen a daughter-in-law once who came to take the victim to the doctor. He said he saw one of the sons once.

Mr. Pittman testified that the Defendant and the victim kept a Doberman and that he never went inside the house because of it. He said that he stayed on the front porch and that he sometimes drank with them. He said he saw the victim drink from a plastic container and that it smelled like beer. He said that he believed the Defendant's company gave him time off to be with the victim. He said the Defendant did a very good job taking care of such an old place. He said that the victim kept a flower garden and that she loved flowers. He said they were proud of their home.

On cross-examination, Mr. Pittman testified that he was aware that the victim had throat cancer and that she smoked a lot of cigarettes. He said he visited her in the hospital

once. He said the victim was not employed after she was diagnosed with cancer. He said she received a check, but he acknowledged that the Defendant paid him. He said he did not see the victim give the Defendant any money. He disagreed that the Defendant did not have a job during the last eight months of the victim's life. He said that the company gave the Defendant some time off. He believed the last time he saw the victim was August 3. He said he did not know if she was drinking on that occasion, but he said that she was on a lot of medication and could hardly communicate. He said she would look at the Defendant, the Defendant would express what the victim wanted to say, and the victim would nod her head in acknowledgment.

In rebuttal, Cora Phillips testified that she was the victim's daughter-in-law and that she was married to the victim's son, Daniel. She said that she was at the victim's house on December 24, 2004, with her husband, her brother-in-law, and her sister-in-law. She did not recall Edward Pittman stopping by the house that day. She identified a picture purported to have been taken on December 24, 2004, although the date stamp on the photograph read 21/1/2002. Ms. Phillips explained that the battery went dead, that they replaced it, and that was how the date "got messed up." She agreed that the victim did not have any hair at that time. She said she drove the victim to the hospital four or five times and to the doctor's office "quite a bit."

The jury convicted the Defendant of second degree murder. The trial court applied one enhancement factor, that the Defendant used a firearm in the commission of the offense, and sentenced the Defendant to sixteen years in the Department of Correction.

## ANALYSIS

### I

On appeal, the Defendant contends that the evidence was insufficient to support his conviction. The State contends that the evidence is sufficient. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Under the statute applicable to the Defendant, second degree murder is defined in pertinent part as the "knowing killing of another." T.C.A. § 39-13-210(a)(1) (2003) (amended 2006). A "knowing killing" requires that the person must be aware that his "conduct is reasonably certain to cause the result." T.C.A. § 39-11-106(a)(20) (2003) (amended 2009). Second degree murder is a Class A felony. T.C.A. § 39-13-210(c). Therefore, the State was required to prove beyond a reasonable doubt that the Defendant was aware that his conduct was reasonably certain to cause the victim's death and that he killed the victim.

We conclude that the evidence is sufficient to support the Defendant's conviction. The proof at the trial was that the Defendant pointed a loaded shotgun at the victim's chest. The Defendant stated on the 9-1-1 call that he was "playing around" with a loaded shotgun, that the victim pulled the gun's barrel, and that it fired. The proof showed that the victim was in a highly intoxicated or stuporous state and that no wounds indicating she pulled on the barrel of the shotgun were found during the autopsy. Although the distance from which the gun was fired was in dispute, we must presume that the jury resolved this conflict in favor of the State. When viewed in the light most favorable to the State, we conclude that any rational trier of fact could have found the elements of second degree murder beyond a reasonable doubt. We hold that the evidence is sufficient to support the Defendant's conviction for second degree murder. The Defendant is not entitled to relief on this issue.

## II

The Defendant contends the trial court erred by allowing the testimony of the State's pharmacology expert witness, Dr. Glen Farr, because he did not receive notice of the expert until two weeks before trial and because he did not receive the expert witness's report until the morning of the trial. Next, the Defendant argues that given the voluminous nature of the expert's report, the trial court should have granted a continuance to allow him time to review the report. The State contends that the trial court properly admitted the expert testimony and that it properly denied the Defendant's motion for continuance.

According to the record, the Defendant received notice on August 20, 2007, that Dr. Glen Farr was going to be called as an expert witness in pharmacology. The trial did not commence until September 11, 2007, twenty-two days later. The State did not receive the expert's report until the night of September 10, at which time it was forwarded electronically to defense counsel, who received it at approximately 4:00 on the morning of the trial. At a pretrial hearing, however, defense counsel stated that he had telephoned Dr. Farr on September 10 and had spoken to him for about an hour and that he had "some sense of what the report was going to look like." Defense counsel did not request a continuance at that time.

During the trial, Dr. Farr was informed that the TBI had made an error in the victim's toxicology report: the .13 μG/mL of oxazepam was in fact .13 μG/mL of oxycodone. Defense counsel spoke with Dr. Farr, who informed him that the new information did not change the expert opinion about the effects of the drugs on the victim. Defense counsel moved for a continuance to allow a defense expert to review the new information. The trial court denied the motion, and defense counsel had the opportunity to speak again with the witness and also exercised the opportunity to cross-examine Dr. Farr. Dr. Farr testified that the effects of oxycodone on the victim would have been essentially the same as the effects of oxazepam and that his opinion of the victim's state at the time of her death had not changed.

Regarding the Defendant's contention that he received inadequate notice of the State's intent to call Dr. Farr as a witness and of the scope of Dr. Farr's testimony, Tennessee Code Annotated section 40-17-106 requires that the names of prospective witnesses appear on the indictment. However, the statute is "directory in nature" and does not disqualify a witness from testifying. See State v. Street, 768 S.W.2d 703, 711 (Tenn. Crim. App. 1988); State v. Morris, 750 S.W.2d 746, 749 (Tenn. Crim. App. 1987). The Defendant is not entitled to relief absent a showing of prejudice. See State v. Reid, 91 S.W.3d 247, 293 (Tenn. 2002); McBee v. State, 213 Tenn. 15, 27 (Tenn. 1963). Our supreme court has held that receiving notice of a witness the day before trial is not prejudicial when the defendant has an opportunity to interview the witness before the trial and to cross-examine the witness during the trial. See State v. Hutchinson, 898 S.W.2d 161, 171 (Tenn. 1994). Rule 16 of the Tennessee Rules of Criminal Procedure allows a defendant to inspect and copy or photograph the results or reports of scientific evidence that are in the state's possession, custody, or control if the item is material to the defense or if the state intends to use the item in its case-in-chief at the trial. Tenn. R. Crim. P. 16(a)(1)(G).

In this case, the Defendant was notified about the expert witness three weeks before the trial. Defense counsel spoke with the expert for an hour before the trial and had "some sense" of the contents of the expert's report. The Defendant was afforded another opportunity to speak with the expert during the trial, and the Defendant cross-examined the expert during the trial. Finally, the Defendant received a copy of Dr. Farr's report within hours of it coming within the State's possession. We hold that the Defendant was not prejudiced by the State's notifying him of its expert witness three weeks before trial or by his receiving the expert report the morning of trial when he was afforded an opportunity to interview the witness before trial and during the trial and to cross-examine the witness.

Regarding the admission of Dr. Farr's testimony, Rules 702 and 703 of the Tennessee Rules of Evidence address the admissibility of opinion testimony of expert witnesses. Questions regarding the admissibility, qualifications, relevancy, and competency of expert

-24-

testimony are left to the discretion of the trial court. McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 263-64 (Tenn. 1997). A trial court's ruling on the admissibility of such evidence may be overturned on appeal only if the discretion is exercised arbitrarily or abused. State v. Stevens, 78 S.W.3d 817, 834 (Tenn. 2002).

The Defendant has failed to show that the trial court abused its discretion or exercised it arbitrarily when it admitted Dr. Farr's testimony. The court acknowledged the TBI's error but also noted that the Defendant was not prejudiced by the error because the effects of the different drug were the same as were originally reported. The court allowed the Defendant ample opportunity to cross-examine Dr. Farr about his report and his opinion in light of the TBI's error. We conclude that the trial court did not abuse its discretion when it admitted Dr. Farr's testimony.

Finally, regarding the Defendant's contention that the trial court abused its discretion when it denied his motion for a continuance, we note that the decision whether to grant a continuance rests within the discretion of the trial court. See State v. Morgan, 825 S.W.2d 113, 117 (Tenn. Crim. App. 1991). The denial of a continuance will not lead to a reversal absent an abuse of discretion and resulting prejudice. See State v. Seals, 735 S.W.2d 849, 853 (Tenn. Crim. App. 1987).

Upon our review of the record, we conclude the Defendant has failed to show that the trial court abused its discretion in denying his motion for continuance and that he was prejudiced as a result. The trial court found that the Defendant received the report before trial, providing him with notice of the subject of the testimony and the evidence against him. The Defendant received the report within hours after the witness presented it to the State. The expert witnesses testified that identical levels of oxazepam or oxycodone would not have differing effects on the victim. The trial court noted the TBI's error and gave the Defendant an opportunity to talk to the expert witness, and the Defendant was allowed to cross-examine the witness about the error. The opinions of the expert did not change as a result of the TBI error. We hold that the trial court did not abuse its discretion in denying the Defendant's motion for a continuance. The Defendant is not entitled to relief on this issue.

### III

The Defendant contends that the trial court erred in allowing the medical examiner, Dr. Sandra Elkins, to testify to the effects of alcohol and narcotics on the victim because Dr. Elkins was an expert in forensic pathology and not an expert in narcotics or pharmaceuticals. The State contends that the trial court did not abuse its discretion in admitting the testimony of Dr. Elkins because she was qualified to render an expert opinion due to her education and formal training. We agree with the State.

-25-

Rules 702 and 703 of the Tennessee Rules of Evidence address the admissibility of opinion testimony of expert witnesses. Rule 702 states in pertinent part: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tennessee Rule of Evidence 703 requires the expert's opinion to be supported by trustworthy facts or data "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." The determining factor is "whether the witness's qualifications authorize him or her to give an informed opinion on the subject at issue." Stevens, 78 S.W.3d at 834. Evidence constitutes "'scientific, technical, or other specialized knowledge,' if it concerns a matter that 'the average juror would not know, as a matter of course.'" State v. Murphy, 953 S.W.2d 200, 203 (Tenn. 1997) (quoting State v. Bolin, 922 S.W.2d 870, 874 (Tenn. 1996)). Questions regarding the admissibility, qualifications, relevancy, and competency of expert testimony are left to the discretion of the trial court. McDaniel, 955 S.W.2d at 263-64. As we noted in the previous section, a trial court's ruling on the admissibility of such evidence may be overturned on appeal only if the discretion is exercised arbitrarily or abused. Stevens, 78 S.W.3d at 832; see also State v. Schuck, 953 S.W.2d 662, 669 (Tenn. 1997) ("an appellate court should find an abuse of discretion when it appears that a trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning").

The Defendant argues that the trial court's decision to admit Dr. Elkins's testimony was an abuse of discretion because it was illogical for the trial court to allow a medical examiner to give testimony regarding the effects of narcotics and alcohol on the victim when the victim was alive. During a motion in limine, the trial court determined that it would allow Dr. Elkins to testify about the effects of the drugs and alcohol on the victim's system because she was a medical doctor. The court stated that the issue was not one of admissibility but of weight.

At the trial, Dr. Elkins testified that she held two bachelor's degrees, one in biology and one in chemistry. She earned her medical degree and then worked for two years as a post-graduate in the fields of general and trauma surgery. She also had an additional three years of training in anatomic pathology and another year in a forensic fellowship. The trial court determined that Dr. Elkins's qualifications authorized her to give an informed opinion about the effects of the drugs on the victim. Dr. Elkins possessed "knowledge, skill, experience, training, or education" which the average juror would not know. T.R.E. 703; see Murphy, 953 S.W.2d at 203. The trial court did not apply an incorrect legal standard or reach a decision which was against reason or logic. We hold that the trial court did not abuse its discretion when it admitted the expert testimony of Dr. Elkins. The Defendant is not entitled to relief on this issue.

# IV

The Defendant contends that the trial court erred in failing to grant a continuance to allow the defense's firearms expert additional time to conduct further tests of the shirt the victim was wearing when she was shot. The State contends that the Defendant has failed to show that the trial court's denial of the motion was prejudicial.

The decision whether to grant a continuance rests within the discretion of the trial court. See Morgan, 825 S.W.2d at 117. The denial of a continuance will not lead to a reversal absent an abuse of discretion and resulting prejudice. See Seals, 735 S.W.2d at 853.

During a pretrial hearing, the Defendant requested a continuance because he had recently learned from his firearms expert that the victim's T-shirt might contain carbon particles. Defense counsel stated that he had received this information on August 31, 2007, just days before the trial. He said that whether carbon particles were present would have a bearing on the distance from the barrel to the victim's wound. After discussion among defense counsel, the State's prosecuting attorney, and the trial court about the expert testimony from the firearms experts, defense counsel stated:

> Actually, Judge, I guess, you know, I could probably live with the state of the proof right now. If Dr. Elkins is going to say the shot was five to eight feet away and the TBI was going to say it's between five and 25 feet away, I can live with that.

The following exchange occurred later:

| THE COURT: | Well, so you are telling me now that you're not concerned about doing the carbon testing? |
|---|---|
| DEFENSE COUNSEL: | What I'm telling you, what she agrees to– |
| THE COURT: | If you can—you can live with five to eight feet? |
| DEFENSE COUNSEL: | I can live with five to eight feet, yes. |
| THE COURT: | So you don't care about carbon testing if that's the testimony? |

DEFENSE COUNSEL:    Then I don't care about carbon testing if she's–if that's what's going to happen.

The record reflects that firearms testing was conducted by the TBI as well as by the defense's firearms expert. At the motion for new trial, defense counsel stated that the defense's firearms expert might have been able to determine that the distance of the shotgun barrel to the T-shirt was between two and three feet, rather than the five to eight feet range to which Dr. Elkins's testified and which defense counsel determined was acceptable in lieu of a continuance. The Defendant conceded his motion for a continuance because Dr. Elkins testified that the shot was from a distance of five to eight feet. Not only has the Defendant failed to show an abuse of discretion and prejudice, we conclude that the Defendant has failed to preserve the issue. See T.R.A.P. 36(a) ("nothing in this rule shall be construed as requiring relief be granted to a party . . . who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error").

**V**

The Defendant contends that the trial court erred in allowing his statements to police to come into evidence. The State contends that the trial court properly admitted the Defendant's statements.

At a pretrial motion to suppress, Officer Phillip Dalton of the Knox County Sheriff's Office testified that he responded to the call at the victim's residence. He said he initially treated the call as an accidental shooting. He said that a dog was barking, that he asked the Defendant to secure the dog, and that he asked the Defendant to step onto the porch. He stated that once the Defendant was on the porch, he asked what had happened. He said the Defendant was obviously intoxicated. He said the Defendant twice asked him if he believed the Defendant had shot the victim. He said that at some later point, Detective L.G. Moore and Detective McKee came to the scene and instructed him to take the Defendant into custody.

On cross-examination, Officer Dalton testified that he recalled that he initially believed that dispatch reported the shooting as a suicide. He said the victim was distraught, staggering, and intoxicated. He said he did not advise the Defendant of his rights. On redirect examination, a copy of the Defendant's 9-1-1 call and Officer Dalton's in-car video were received into evidence.

On recross-examination, Officer Dalton said that after the other two officers arrived, he did not participate in the discussion with the Defendant. Officer Dalton said that if the

Defendant had tried to leave, he "probably [would] not" have let him. On redirect examination, Officer Dalton testified that he would not have arrested the Defendant but that he would have wanted him to remain at the residence.

Detective L.G. Moore testified that he responded to the shooting at the victim's residence. He testified that the Defendant was sitting on the porch. He said he informed the Defendant of his Miranda rights but did not get a written waiver. See Miranda v. Arizona, 384 U.S. 436 (1966). He said that after he read the Defendant his Miranda rights, he began recording the conversation. A transcript of the statement was received into evidence. He said that after a concern arose whether the shooting was accidental, he handcuffed the Defendant and transported the Defendant to the Detention facility.

On cross-examination, Detective Moore testified that he had a Miranda rights waiver in his car, but he did not want to walk back to retrieve it. He agreed that he did not turn on the recorder until after he had advised the Defendant of his rights and that there was no proof that he advised the Defendant of his rights. He agreed that on the first two pages of the transcript of that recording, the Defendant stated five times, "I don't want to talk to you." He also agreed that he continued to talk to the Defendant. He said that he did not read the Miranda rights to the Defendant from a written form but recited them from memory. He said that he interpreted the Defendant's statements "I don't want to talk about it" as the Defendant was upset. When asked what the Defendant's statement "You can talk about it tomorrow" meant, he said he thought he would have to talk to the Defendant again. He agreed that he did not stop and tried a fifth time to elicit a statement from the Defendant.

Detective Moore testified that he did not have to stop talking to the Defendant until the Defendant invoked his right to counsel. He agreed that the way he understood the law was that he did not have to stop interrogating a defendant if the defendant expressed a desire to cease interrogation. He said the Defendant told him the Defendant held the weapon and the victim grabbed the barrel and pulled it to her chest. He agreed that the Defendant told the same story repeatedly.

The trial court granted the Defendant's motion to suppress in part and denied it in part. The court stated that Officer Dalton's initial inquiries were necessary in responding to a call and that any statements made during that conversation were admissible. However, the court found that once the Defendant was directed to go outside and sit on the porch, the circumstances of the investigation changed, and this order to the Defendant constituted a custodial situation. The court determined that Detective Moore further reinforced the custodial situation when he read the Defendant his Miranda rights and that the Defendant clearly stated his desire to remain silent.

Before jury selection, defense counsel informed the court that Officer Dalton instructed the Defendant to go outside not once, but twice. The Defendant refused Officer Dalton's first request and only went outside when Officer Dalton again instructed the Defendant to go onto the porch. The following is a partial transcript of Officer Dalton's in-cruiser recording:

| | |
|---|---|
| OFFICER DALTON: | Whoa dog will bite. (talking to other officer.) Is this the shotgun? |
| THE DEFENDANT: | Yeah, that's the shotgun. |
| OFFICER DALTON: | Does she have a pulse at all? |
| THE DEFENDANT: | I don't know. |
| OFFICER DALTON: | <u>Do me a favor, step out here?</u> |
| THE DEFENDANT: | She pulled the gun.  She was playing with it.  And she pulled it.  It shot her in the chest.  She may be still alive. |
| OFFICER DALTON: | You got a pulse anywhere? |
| THE DEFENDANT: | She pulled the damn gun and it went off.  Wait a minute. (talking and dog barking) |
| OFFICER DALTON: | She's inside. |
| THE DEFENDANT: | Shut that door, in there.  Don't let that dog out. |
| [UNIDENTIFIED]: | Get in here and shut the door so we don't have to kill the dog.  Get in here and shut the door real quick. |
| OFFICER DALTON: | Has she been drinking? |

THE DEFENDANT: We both been drinking. She reached and got the damn gun and it went off.

OFFICER DALTON: Get your dog O.K.? Anybody else in the house?

THE DEFENDANT: No. We were just playing around. She reached and got the end of the and pulled the end of the gun and pulled it and the son of a bitch went off.
No, ain't nobody else here.
We was just fooling around and she reached and got the gun.
Oh Lord, oh Lord.

OFFICER DALTON: Let me see your ID. How old is she?

THE DEFENDANT: She's thirty some year old.

OFFICER DALTON: She's thirty something?

THE DEFENDANT: Forty. We have lived together for about 5 years.

OFFICER DALTON: How much have each one of ya'll had to drink?

THE DEFENDANT: Aw, not to[o] much. We were just sitting here with the gun. She pulled it.

OFFICER DALTON: She pulled the gun towards her?

THE DEFENDANT: Yeah. Hell yeah. It went off. It shot her right in the God damn chest. I said man don't . . . .

| | |
|---|---|
| OFFICER DALTON: | We cleared the gun. She's 91. (talking)<br>When she pulled it who had the handle? |
| THE DEFENDANT: | Well, I had the handle. Yeah I had the gun trying to show her how to use it. She pulled it. It went off. I said God dam [sic]. We were just fooling around. Is she dead. |
| OFFICER DALTON: | The ambulance is here. We just need to do everything we can.<br>Does she have a purse or anything.<br>What's her name.<br>Does she have a purse? |
| THE DEFENDANT: | It's right there.<br>We were just fooling around?<br>Is she dead? |
| OFFICER DALTON: | Come on outside with me. Get out of these guys way. You just have a seat out here. |

(Emphasis added.)

The trial court clarified its suppression order to apply to the statements the Defendant made after he actually went onto the porch. The court said that its suppression order did not apply to anything the Defendant said between Officer Dalton's first and second requests to go outside. The court based its decision on its determination that between the two requests, Officer Dalton was conducting a preliminary investigation and trying to determine what had happened to the victim. The court said that once the Defendant was on the porch, the nature of the officers' actions changed from "investigating mode" to "interrogating mode." The Defendant contends that the suppression ruling should have applied to the Defendant's statements after Officer Dalton asked the Defendant, "Do me a favor, step out here?"

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the

-32-

"credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. The State, as the prevailing party, is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001). The application of the law to the facts as determined by the trial court is a question of law which we review de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

We conclude that the evidence does not preponderate against the trial court's findings that Officer Dalton was conducting an initial investigation into the shooting during the time he was inside the residence with the Defendant. The record reflects that after Officer Dalton first requested that the Defendant step outside, the Defendant volunteered information about the circumstances surrounding the shooting. The Defendant is not entitled to relief on this issue.

## VI

The Defendant contends that the trial court erred in allowing the State to amend TBI Agent John Harrison's toxicology report during trial and in refusing to grant a continuance. The Defendant argues that the defense theory was that he and the victim were struggling over the shotgun when it accidentally discharged and that not allowing a continuance in order to seek independent expert review was prejudicial. The State contends that the trial court did not abuse its discretion in denying the Defendant's request for a continuance.

The decision whether to grant a continuance rests within the discretion of the trial court. See Morgan, 825 S.W.2d at 117. The denial of a continuance will not lead to a reversal absent an abuse of discretion and resulting prejudice. See Seals, 735 S.W.2d at 853.

On the morning of the trial, TBI Agent John Harrison noticed that he had incorrectly reported that the victim had oxazepam in her system instead of oxycodone. Defense counsel telephoned the pharmacology expert, Dr. Glen Farr, and in that discussion learned that Dr. Farr's opinion remained unchanged. Dr. Farr's opinion was that the oxazepam and oxycodone would have the same effects on the victim. Dr. Elkins also testified that the oxazepam and oxycodone would have the same effects on the victim.

In denying the Defendant's motion for a continuance, the trial court stated:

> Today we found out that the accurate report is that it was not a
> benzodiazepine [oxazepam] but rather oxycodone at the same
> level, 13 UG/ML. Mr. Stephens was concerned that this was

going to change the analysis by Dr. Farr who was prepared to testify based on the alcohol content and the benzodiazepine content. Mr. Stephens advises me that he's talked with Dr. Farr just in the last few minutes and has been advised by him that it would have no appreciable different [e]ffect. In other words, the OxyContin would have essentially, the effect as the benzodiazepine, and at this dosage it would be the same.

He has moved for a continuance saying that he would like the opportunity to have his own person examine this and take a look at it. I am of the opinion that I'm not going to grant that motion because I think that essentially this leaves him in a neutral position. In other words, although it's a drug by a different name, according to the expert, it has the same impact as the original identified drug, and therefore, it is not prejudicial to the defendant in any way to allow it to continue, notwithstanding the fact that the actual drug was identified as an incorrect substance.

The Defendant was given the opportunity to discuss the error with Dr. Farr before he cross-examined Agent Harrison, Dr. Farr, and Dr. Elkins. Dr. Farr and Dr. Elkins testified that the effects of the oxazepam and the oxycodone would not be different. We hold that the Defendant has failed to show that the trial court abused its discretion and how he was prejudiced by the denial of his motion a for continuance. The Defendant is not entitled to relief on this issue.

**VII**

The Defendant contends that the trial court erred in failing to respond properly to a jury question requesting a definition of "heat of passion" and whether "voluntary intoxication" was "heat of passion." The State contends that the trial court properly responded to the jury question and that the Defendant has waived his right to raise this issue on appeal because he failed to object to the court's instruction.

In criminal cases, the trial court must give "a complete charge of the law applicable to the facts of the case and the defendant has a right to have every issue of fact raised by the evidence and material to his defense submitted to the jury upon proper instructions by the judge." State v. Thompson, 519 S.W.2d 789, 792 (Tenn. 1975). An erroneous jury instruction deprives the defendant of the constitutional right to a jury trial and is subject to a harmless error analysis. See State v. Garrison, 40 S.W.3d 426, 433-34 (Tenn. 2000). A

-34-

jury instruction must be reviewed in its entirety and read as a whole rather than in isolation. State v. Leach, 148 S.W.3d 42, 58 (Tenn. 2004). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005) (citing State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998)). A trial court has "the authority to give supplemental instructions when the jury poses a question that indicates the jurors are confused regarding a question of law." State v. Dulsworth, 781 S.W.2d 277, 288 n.6 (Tenn. Crim. App. 1989); see State v. Moore, 751 S.W.2d 464, 467-468 (Tenn. Crim. App. 1988); State v. McAfee, 737 S.W.2d 304, 307 n.2 (Tenn. Crim. App. 1987).

"State of passion" or "heat of passion" has been defined in our case law as "provocation of a sufficient character," Rader v. State, 73 Tenn. 610, 620 (1880), and as "any of the range of emotions known as anger, rage, sudden resentment or terror which renders the mind incapable of cool reflection." Drye v. State, 184 S.W.2d 10, 13 (Tenn. 1944); see also State v. Bullington, 532 S.W.2d 556, 559 (Tenn. 1976); State v. Tune, 872 S.W.2d 922, 926 (Tenn. Crim. App. 1993). Our supreme court has held that the word "passion" is "in common use and can be understood by people of ordinary intelligence." State v. Mann, 959 S.W.2d 503, 522 (Tenn. 1997). As long as nothing in the jury charge obscures the meaning of the word "passion," it is not necessary for the court to define or explain it. Id.

During the jury charge, the trial court instructed the jury that if it had reasonable doubt as to the Defendant's guilt of second degree murder, it should determine whether the Defendant was guilty of voluntary manslaughter. The jury charge listed the elements of voluntary manslaughter as: "(1) that the defendant unlawfully killed [the victim]; and (2) the defendant acted intentionally or knowingly; and (3) the killing resulted from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner."

During deliberations, the jury asked, "On element three of voluntary manslaughter, what is the definition of 'state of passion,'" and, "Does intoxication qualify as a state of passion?" The trial court responded:

> There is no legal definition of "State of Passion." You, as jurors, should rely on your common understanding of what constitutes "State of Passion[.]" Intoxication, standing alone, would not qualify as a State of Passion.

While the jurors continued their deliberations, defense counsel, the State's prosecuting attorney, and the trial court placed the jury's questions and the trial court's response on the

record. The court noted that defense counsel had objected to the court's response but had not been able to offer an appropriate instruction at the time. The following exchange occurred:

THE COURT: Our response was, after talking to the lawyers and getting their agreement, although [defense counsel] wasn't sure he should agree to anything and objected, but had no–

DEFENSE COUNSEL: I do now.

THE COURT: Oh, do you? Okay, well–
. . . .

DEFENSE COUNSEL: [T]here's plenty of case law that defines state of passion, and . . . my thinking is probably on balance, or in retrospect, it probably would have been better to give them case law or common law definition of state of passion than to just say, "Rely on your own judgment," but I didn't offer that when I was in your chambers, so . . . .

THE COURT: Okay. Well, my response was that there is no legal definition of state of passion. You as jurors should rely on your common understanding of what constitutes state of passion. Intoxication, standing alone, would not qualify as a state of passion."

Tennessee Code Annotated section 39-13-211 defines voluntary manslaughter as "an intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner," but the Code does not define "state of passion." See T.C.A. § 39-13-211 (2003). However, our case law provides definitions of "passion." See Bullington, 532 S.W.2d at 560 (quoting Drye,184

S.W.2d at13). The court should have clarified the jury instruction based on the case law definitions, and the failure to do so was error. Furthermore, the trial court's erroneous supplemental instruction may have obscured the meaning of "passion." See Mann, 959 S.W.2d at 522. The court correctly instructed the jury that a state of passion could not result from "intoxication, standing alone," but it did not clarify the circumstances in addition to intoxication that would permit the jury to determine that the Defendant's conduct resulted from passion. See Bullington, 532 S.W.2d at 560 (noting that a "jury may consider his state of intoxication along with all other facts of the case to determine whether the killing . . . resulted from passion excited by inadequate provocation"); Cartwright v. State, 76 Tenn. 376, 382 (1881) (holding that "the jury may consider the drunkenness in connection with all the facts, to see whether the purpose to kill was formed in passion produced by a cause operating upon a mind excited with liquor"); see also Mann, 959 S.W.2d at 522.

We must now determine whether that error prejudiced the Defendant. A jury instruction is "prejudicially erroneous only if the jury charge, when considered as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." Faulkner, 154 S.W.3d at 48. The jury instructions included the elements of the charged offense of second degree murder and of the lesser included offenses of voluntary manslaughter, reckless homicide, and criminally negligent homicide. The trial court had defined voluntary manslaughter in the jury charge as a killing which resulted from a state of passion "produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." This language tracks the statute defining voluntary manslaughter and is in line with our case law. See T.C.A. § 39-13-211; Rader, 73 Tenn. at 620. Nothing in the record reflects that the Defendant killed the victim after being provoked to an irrational state. The Defendant's admissions to the 9-1-1 operator and to the police were that he and the victim were playing with the gun and it went off. The jury convicted the Defendant of second degree murder and rejected the lesser included offense of voluntary manslaughter, indicating that the jury was not mislead as to the applicable law. We conclude that when viewed in their entirety, the jury instructions did not fail to submit fairly the legal issues or to mislead the jury as to the applicable law. The erroneous supplemental instruction was harmless, and the Defendant is not entitled to relief on this issue.

In consideration of the forgoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE